**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0298n.06

**No. 09-3721**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**May 13, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| WHITT MACHINE, INC., | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | O P I N I O N |
| Defendant-Appellee. | ) | |

BEFORE:    COOK and McKEAGUE, Circuit Judges; HOOD, District Judge.[*]

**McKEAGUE, Circuit Judge.**  Whitt Machine and Essex Insurance Company dispute the

extent of coverage under an insurance policy (the "Policy") for loss resulting from a fire that

damaged a building owned by Whitt Machine and located at 800/806 Central Avenue, Middletown,

Ohio (the "800/806 Building").  Because the relevant Policy provisions are unambiguous and support

Essex's position, we **AFFIRM** the district court's decision.

## I.  BACKGROUND

Whitt Machine owns the property located at the 800/806 Building, which Essex insured

under the Policy.  Among other things, the Policy provided coverage for certain fire loss.  The Policy

deductible was and is $5,000.00.  On or about May 26, 2007 a fire demolished the 800/806 Building

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Northern District of
Ohio, sitting by designation.

and the resulting loss exceeded the Policy limits. Essex paid Whitt Machine $600,000 to cover the direct physical loss of the building, and offered an additional $10,000 to Whitt Machine under the debris removal coverage provisions of the Policy; however, Whitt Machine refused to accept the additional $10,000. The actual costs for debris removal exceeded $10,000.

The case was filed in the Ohio Court of Common Pleas for Butler County. It was removed to federal district court on the basis of diversity jurisdiction on June 26, 2008. Both parties filed a motion for partial summary judgment. The district court granted summary judgment for Essex, and denied summary judgment for Whitt Machine, on April 14, 2009.

### 1. Relevant provisions for the debris removal issue

The first issue in dispute deals with the extent of coverage for debris removal. The disputed portions of the Policy state that:

A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

1. Covered Property

***

2. Property Not Covered

***

3. Covered Causes of Loss

***

4. Additional Coverages

a.  Debris Removal

(1) We will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) The most we will pay under this Additional Coverage is 25% of:

(a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

(b) The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section.

***

B.  EXCLUSIONS AND LIMITATIONS

See applicable Causes of Loss Form as shown in the Declarations.

C.  LIMITS OF INSURANCE

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs attached to buildings is $1,000 per occurrence.

The limits applicable to the Coverage Extensions and the Fire Department Service Charge and Pollutant Clean Up and Removal Additional Coverages are in addition to the Limits of Insurance.

Payments under the following Additional Coverages will not increase the applicable Limit of Insurance:

1.  Preservation of Property; or

2.  Debris Removal; but if

>    a.  The sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance; or
>
>    b.  The debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage;
>
>    we will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage. . . .

(R. 9-1 Insurance 16-18 (formatting taken from original; bold formatting replaced with underlining).)

### 2.  Relevant provisions for the pollution clean up issue

The second issue in dispute is whether the Policy provides some additional coverage for pollutant clean up and removal.  The relevant disputed section of the Policy states that:

A.  COVERAGE

***

4.  Additional Coverages

***

   a.  Debris Removal

***

   d.  Pollutant Clean Up and Removal

>    We will pay your expense to extract 'pollutants' from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the 'pollutants' is caused by or results from a Covered Cause of Loss that occurs during the policy period. . . .
>
>    The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12 month period of this policy.

(R. 9-1 Insurance 16-17 (formatting taken from original; bold formatting replaced with underlining).) However, under the "Common Policy Conditions" it states that: "This policy contains all the agreements between you and us concerning the insurance afforded. . . . This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy." (R. 9-1 Insurance 6); *see also* (R. 9-1 Insurance 12 ("CHANGE IN CONDITIONS ENDORSEMENT – Please read carefully as this changes coverage under your policy.")). The Policy contains a relevant endorsement, the "Property Pollution Exclusion" Endorsement, which states that:

> This policy does not cover loss or damage caused directly or indirectly by the release or discharge or dispersal of toxic or hazardous substances, contaminants, or pollutants. Nor will we cover the cost of removal, disposal, decontamination or replacement of insured property which has been contaminated by toxic or hazardous substances, contaminates or pollutants and by law or civil authority must be restored, disposed of or decontaminated. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

(R. 9-1 Insurance 12.)

## II. ANALYSIS

### 1. Standard of Review

This court reviews de novo the district court's grant of summary judgment. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006). Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When jurisdiction is based on diversity of citizenship, state substantive law is used when interpreting contract provisions. *See Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566 (6th Cir. 2001).

### a. Ohio substantive law

The Ohio Supreme Court has stated that an insurance policy is a contract, which must be interpreted by utilizing "the familiar rules of construction and interpretation applicable to contracts generally." *See, e.g.*, *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982) (citation omitted); *see also Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 597 N.E.2d 1096 (Ohio 1992). An insurance contract, "is to be given a reasonable construction in conformity with the *intention of the parties* as gathered from the ordinary and commonly understood meaning of the language employed." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001) (emphasis in original) (quoting *Dealers Dairy Products Co. v. Royal Ins. Co.*, 164 N.E.2d 745 (Ohio 1960)); *see also Hybud*, 597 N.E.2d at 1102 ("[T]he most critical rule is that which stops this court from rewriting the contract when the intent of the parties is evident, *i.e.*, if the language of the policy's provisions is clear and unambiguous, this court may not 'resort to construction of that language.'"). Furthermore, "[t]he intention of the parties must be derived . . . from the instrument as a whole, and not from detached or isolated parts thereof." *Gomolka*, 436 N.E.2d at 1351 (citations omitted).

In general, "insurance policies are interpreted strictly against the insurer," and therefore, "in order to defeat coverage, 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed

on the language in question.'" *Anderson*, 757 N.E.2d at 332-33 (quoting Reiter, Strasser & Pohlman, *The Pollution Exclusion Under Ohio Law: Staying The Course*, 59 U. CIN. L. REV. 1165, 1179 (1991)) (noting also that it is "not suffic[ient] for [the insurer] to demonstrate that its interpretation is more reasonable than the policyholder's" and that "[w]here provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured" (internal quotations omitted)). However, "it is equally well settled that a court cannot create ambiguity in a contract where there is none" and that "[a]mbiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citation omitted).[1]

### ii. Endorsements

"Where exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." *Home Indem. Co. v. Village of Plymouth*, 64 N.E.2d 248, 248, 251 (Ohio 1945) (citation omitted) ("Nothing but a clear and unambiguous expression in an exception clause, amounting to a necessity for it, will justify a court in holding it utterly inconsistent with the preceding general coverage clauses."). However, where a policy endorsement conflicts with another policy form, the endorsement controls. *See e.g.*, *Workman v.*

---

[1]Although in some jurisdictions, insurance contacts can be interpreted, at least in part, by taking into consideration the "reasonable expectations" of the insured regarding the coverage provided by the policy despite the fact that the policy language negates such expectations, this doctrine has not been adopted by the Ohio Supreme Court. *See Wallace v. Balint*, 761 N.E.2d 598, 606 (Ohio 2002) (noting that "there is not yet a majority on this court willing to accept the reasonable-expectations doctrine").

*Republic Mut. Ins. Co.*, 56 N.E.2d 190, 194 (Ohio 1944) (overruled on other grounds by *Brewer v. De Cant*, 149 N.E.2d 166, 168-69 (Ohio 1958)) ("The endorsement must be regarded as a modification of the terms of the original contract of insurance if a clear inconsistency appears."); *see also* (R. 9-1 Insurance 12 ("CHANGE IN CONDITIONS ENDORSEMENT – Please read carefully as this changes coverage under your policy.").)

**2. Additional coverage for debris removal claim**

Looking at the Policy in its entirety, we find that the district court was correct in interpreting the Policy as unambiguously supporting Essex's interpretation. The Policy divides into a number of sections: "A. COVERAGE"; "B. EXCLUSIONS AND LIMITATIONS"; "C. LIMITS OF INSURANCE"; etc. Some of those sections contain subsections. In particular, "A. COVERAGE" contains "Subsection 4. – Additional Coverages" and "Subsection 4" contains "Subsection a. – Debris Removal." When viewed in this larger context, it is clear that "Section A.4.a." is a part of the general coverage section, which, like all of "Section A," is subject to "Section C', which states the Limits of Insurance. This is true even though, like the other parts of "Section A," "Section A.4.a." does not explicitly state that it is subject to the limits in "Section C." Thus, even though "Subsection A.4.a." broadly states that, "[w]e will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period," this promise is not absolute but, like the other parts of "Section A," it is subject to the limits in "Section C," unless the Policy provides otherwise.

The remainder of "Subsection A.4.a." does not state otherwise. Instead, "Section A.4.a." goes on to state that:

(2) The most we will pay under this Additional Coverage is 25% of:

(a) The amount we pay for the direct physical loss of or damage to Covered Property; plus

(b) The deductible in this policy applicable to that loss or damage.

But this limitation does not apply to any additional debris removal limit provided in the Limits of Insurance section

This phrase, "[t]he most we will pay," indicates that this is an additional limit on whatever debris removal coverage the Policy provides, and does nothing to remove the general language in "Section C." Furthermore, Whitt Machine's efforts to eliminate the overall policy limitations in "Section C" through the last sentence of "Subsection A.4.a." are unavailing.[2] That language may be ambiguous, but not in the way Whitt Machine tries to read it and not in a way that undermines the entire Policy and, therefore, somehow, means that Whitt Machine wins. The fact that "this limitation," which clearly refers to the limit of 25% of direct physical loss of or damage to covered property plus the deductible laid out in (2)(a) and (2)(b), "does not apply to any additional debris removal limit provided in the Limits of Insurance section" does not mean that the overall Policy limit provided in the Limits of Insurance section does not apply to "Subsection A.4.a." Instead, even if the *limitation* in "Subsection A.4.a." does not apply to any *additional limit* in "Section C," this does not mean that

---

[2]Whitt Machine reasons that this phrase can "only mean that the 25% amount will *not* be limited by any other limit in the Limits of Insurance." (Appellant Br. 11 (emphasis in original).)

the *overall limit* in "Section C" does not apply to "Subsection A.4.a."[3] Thus, "Subsection A.4.a"

does not limit or eliminate the overall policy limit provided in "Section C."

There is only one other relevant section of the Policy, "Section C," which states generally

that, "[t]he most we will pay for loss or damage in any one occurrence is the applicable Limit of

Insurance shown in the Declarations." This language is broad and clearly includes within its limits

the loss or damage stemming from debris removal. Thus, the total limit of $600,000 also applies to

"Subsection A.4.a." unless something else removes this limit.

The next two relevant provisions in "Section C" describe the "Additional Coverages" listed

in "Subsection A.4." The first provision contains some of the "Additional Coverages," but not

Debris Removal, which is contained in the second provision.[4] The first provision states that "[t]he

limits applicable to the . . . Fire Department Service Charge and Pollutant Clean up and Removal

Additional Coverage are in addition to the Limits of Insurance." Both parties seem to agree that the

limitations in this first provision mean that, for these selected additional coverages, the "in addition"

language means that the insured can recover under these additional coverages even though the Limit

---

[3]Instead, this language (referring to any additional debris removal limit provided in the Limits of Insurance) is either not applicable (after all, it states that it does not apply "to any additional" limit, not that there must be an additional limit), or it refers to the additional limit of $10,000 that is provided in "Section C" if the overall policy limit is maxed out, or if the debris removal costs exceed 25% of the direct physical loss of or damage to Covered Property (thus, the additional $10,000 provided in "Section C" for debris removal is not subject to the further 25% limitation in "Section A.4."). Whitt Machine's suggested reading is simply not reasonable.

[4]The Additional Coverages provision of the Policy lists four additional coverages. Two are listed in the first provision: (1) the Fire Department Service Charge and (2) Pollutant Clean Up and Removal. Two are listed in the second provision: (3) Debris Removal and (4) Preservation of Property.

of Insurance ($600,000 in this case) has been reached.  In fact, Whitt Machine is also seeking recovery (of an additional $10,000) under the Pollutant Clean Up Additional Coverage, "Section A.4.d.," for its asbestos clean up costs.  In any event, the second provision is critical, and it states that "[p]ayments under the [Preservation of Property and Debris Removal] Additional Coverages will not increase the applicable Limit of Insurance."  The only reasonable way to read this sentence, even allowing for the different language in the first provision, is that it means that the payments for debris removal will not increase the overall limit and, since they are still subject to it, they cannot go beyond it.

Similarly, the concluding exception in "Section C," which provides that if *either* "[t]he sum of direct physical loss or damage and debris removal expense exceeds the Limit of Insurance" *or* "debris removal expense exceeds the amount payable under the 25% limitation in the Debris Removal Additional Coverage" *then* Essex "will pay up to an additional $10,000 for each location in any one occurrence under the Debris Removal Additional Coverage" does not undermine this reading.  This provision simply allows an additional $10,000 to be paid, under certain circumstances, in spite of the overall ($600,000) limit on insurance.  The fact that "additional" is before $10,000 does not mean that the $10,000 requires that a certain additional amount be paid (other than the $10,000) under the debris removal additional coverage.  Rather, it means that, despite the limitations in both "Section C" and "Subsection A.4.a.," an additional $10,000 can be paid if the circumstances

articulated in "Section C.2.a.-b." are met. Therefore, the $10,000 does not eliminate the other policy

limits, and it is in addition to the overall policy limit in this case.[5]

In short, after examining all the relevant provisions, we agree with the district court that the

only reasonable reading of the Policy is that the Limits of Insurance in "Section C" ($600,000) apply

to "Subsection A.4.a." and that there is no reason in the Policy language to remove these limits.

Consequently, we affirm the district court's decision and uphold Essex's reading of the Policy

language concerning debris removal.

### 3. Pollution removal claim

The language of the Policy also unambiguously shows that the Policy does not provide

additional coverage for Whitt Machine's pollution removal costs. The Policy states in "Section

A.4.d" under "Additional Coverages" that Essex will: "pay your expense to extract 'pollutants' from

land or water at the described premises if the discharge, dispersal, seepage, migration, release or

---

[5]Four cases discussing nearly identical policy provisions are analyzed in some detail by both parties. Three cases support Essex's position: (1) *Strowig Properties, Inc. v. American States Ins. Co.*, 80 P.3d 72 (Kan. App. 2003); (2) *Genovese v. Twin City Fire Ins.*, 1994 WL 228580 (Conn. Super. May 17, 1994); (3) *Katz v. Certain Undrs. at Lloyd's of London*, 2009 Phila. Ct. Com. Pl. Lexis 90 (May 4, 2009). One case supports Whitt Machine's position: (4) *LGC Investments, Inc., LLC,* 2006 WL 1508708. As this court noted in *Park-Ohio Industries, Inc. v. Home Indem. Co.*, 975 F.2d 1215, 1220 (6th Cir. 1992), the fact that other courts have found a policy ambiguous does not, as a matter of law, make that policy ambiguous in Ohio.

In *LGC Investment, Inc.*, the court found that a policy with nearly identical relevant language was ambiguous, and that it could have multiple reasonable interpretations. Initially, *LGC* is distinguishable because the additional $10,000 limit (or provision) was included within the "Additional Coverages" section (in particular, in subparagraph 4) instead of in the Limits of Insurance section (as is the case here). *LGC*, 2006 WL 1508708 at *1. This different placement may have changed how *LGC* interpreted the overall structure of the policy it was analyzing. In any event, *LGC* does not persuade us that the language here is ambiguous.

escape of the 'pollutants' is caused by or results from a Covered Cause of Loss that occurs during the policy period." The expense to extract pollutants dispersed by the fire (a covered cause of loss) would place this under "Section A.4.d." Thus, if this were the only provision in the Policy, it seems that Essex would owe Whitt Machine $10,000. However, the Policy also contains an Endorsement which must be considered, and which prevents coverage.[6]

The Endorsement states that it "does not cover loss or damage caused directly or indirectly by the release or discharge or dispersal of toxic or hazardous substances, contaminants, or pollutants." We find that this language excludes coverage because the loss or damage here was caused, at least in part, directly or indirectly, by the release, discharge or dispersal of asbestos. The fire was also a cause of the loss or damage. However, the fact that the fire was also a cause of the damage does not mean that the Endorsement does not apply. Instead, the loss or damage here falls under both "Section A.4.d." and the Endorsement and the language of the Endorsement and the

---

[6]Prior to the fire, the 800/806 Building contained "asbestos-containing material" that was not hazardous. As a result of the fire, friable asbestos was created from the burning of the asbestos-containing material in the 800/806 Building. Whitt Machine points out that the pre-fire asbestos-containing material was not a hazardous pollutant in its then existing condition. (Appellant Br. at 22.) It cites to an affidavit for this proposition, which states that, "[t]he [asbestos-containing material] was non-hazardous in its form pre-Fire." (R. 11 Snarski ¶ 6.) However, even if the asbestos was in a non-hazardous (non-friable) form before the fire, it was still a pollutant, and therefore, still covered under the Endorsement. *See Selm v. American States Ins. Co.*, 2001 WL 1103509, *3 (Ohio App. 1 Dist. Sept. 21, 2001) (construing very similar policy provision to find that, "[t]here is no doubt that asbestos is an irritant or contaminant, and therefore a pollutant under the policy"). The Endorsement applies not just to pollutants, but also to toxic or hazardous substances and contaminates. Furthermore, friable asbestos, which resulted from the fire, was a pollutant, and it is clear that the loss or damage from pollution that Whitt Machine seeks recovery for here was also caused by the release, discharge, or dispersal of friable asbestos, which, in turn, was created by the release, discharge, or dispersal of asbestos.

language of the additional coverage for pollution clean up conflict. In this situation, under Ohio law, the Endorsement governs.

Whitt Machine makes several arguments to the contrary. First, it tries to place its claim for asbestos removal under "Section A.4.d." and explain how the Endorsement does not conflict because it only seeks to clean up and remove friable asbestos caused by the fire (a Covered Cause of Loss) and, therefore, that the damage was caused by the fire, not the pollution. (Appellee Br. 25.) However, even if the fire caused the release, discharge or dispersal of asbestos, the Endorsement still prevents coverage because the damage from pollution Whitt Machine now seeks to recover for under "Section A.4.d." was also caused, directly or indirectly, by the release, discharge or dispersal of asbestos and, therefore, prohibited by the Endorsement. Consequently, the Endorsement conflicts with "Section A.4.d." Under these circumstances, the Endorsement governs and prohibits coverage.

Whitt Machine also argues that *Stiriz v. Motorists Mut. Ins. Co.*, 2002 WL 479826 (Ohio Ct. App. 6 Dist. March 29, 2002) shows that: (1) "the pollution coverage language and the [Endorsement] can be reconciled to provide coverage caused by a covered cause of loss, just as Whitt Machine requests here," and (2) if the Endorsement eliminated all coverage, the pollution portion of the policy would be meaningless and unenforceable (and, therefore, against public policy in Ohio). (Appellant Br. at 27.); *see also Stiriz*, 2002 WL 479826 at *5 (finding that the pollution exclusion was clear and unambiguous and that it superceded the additional coverage for pollutant clean up provision).[7]

---

[7]Whitt Machine also analogizes to *Gonzalez v. Western Mut. Ins. Co.*, 2004 WL 3019113 (Cal App. 4 Dist. Dec. 30, 2004). Initially, *Gonzalez* is a "nonpublished/noncitable" case under the

The first argument is incorrect because, while *Stiriz* involved a nearly identical policy provision to "Section A.4.d.," concerning additional coverage for pollutant clean up, it also, in contrast to the Endorsement in this case, provided a pollution exclusion in its definition of a "Covered Cause of Loss" (instead of in a separate endorsement):

> According to the policy, "Covered Cause of Loss" means risks of direct physical loss, but does not include "loss or damage caused by or resulting from" the "discharge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss'." Specified causes of loss include, in part, lightning, windstorm or hail, vehicles, vandalism, sinkhole collapse, falling objects, weight of snow, ice or sleet, and water damage (which does not include rain).

---

California Rules of Court. *See* CAL. RULES OF COURT §§ 8.1105, 8.1110, 8.1115. However, *Gonzalez* is also distinguishable on several grounds. First, in *Gonzalez*, the parties agreed that there was no dispute that the "fire was the sole cause of the claimed loss." 2004 WL 3019113 at \*1-\*2. Furthermore, the language of the policy in *Gonzalez* differs from the language in the Endorsement here. In *Gonzalez*, the language stated:

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss . . .
>
> Pollution. All loss, damages, costs and/or expenses arising out of or caused by pollution, and all costs and/or expenses incurred by you to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contamination, including but not limited to vapor, fumes, acids, alkalis, chemicals, asbestos and waste. Waste includes but is not limited to material to be recycled, reconditioned or reclaimed.

*Id.* at \*1 (emphasis removed from original opinion). In contrast, the Endorsement here covers loss *or damage* that is caused not just by pollution, but by the *release or discharge or dispersal* of toxic or hazardous substances, contaminants, or pollutants. This language is broader than the language in *Gonzalez*. In any event, *Gonzalez* does not persuade us that the language of the Policy is ambiguous.

2002 WL 479826 at *2. This language is different from the Endorsement, since it envisions coverage for loss or damage resulting from the discharge, dispersal, seepage, migration, release or escape of pollutants if, "the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.'" *Id.* In contrast, the Endorsement makes no such allowance.

Concerning the second argument, *Stiriz* did state that "the pollution exclusion is not so broad and general as to eliminate all pollution coverage, thereby rendering the coverage language meaningless, against public policy, or unenforceable." *Id.* at * 5. However, even if an insurance policy eliminates pollution coverage, like the Policy in this case, it would not consequently be invalid as against public policy. *Stiriz* does not cite to any case law supporting this proposition. Clearly a valid insurance policy can be sold without providing pollution coverage. If a policy can be sold without pollution coverage, but while still providing substantial coverage – as the Policy here did – then there is no reason why the Policy cannot eliminate additional coverage for pollution clean up through an Endorsement, even though that renders the additional coverage for pollution clean up meaningless and unenforceable. That is simply the way the contract is written, and the terms that Whitt Machine agreed to.

In short, after examining all the relevant provisions, we find that the only reasonable reading is that the Endorsement applies to the damages for asbestos removal that Whitt Machine is seeking here, and that it conflicts with and supercedes "Section A.4.d." Consequently, we affirm the district court's decision and uphold Essex's reading of the Policy language.

### III. CONCLUSION

Because the relevant Policy provisions are unambiguous and support Essex's position on both the issue of debris removal and the cost for removing the asbestos, we **AFFIRM** the district court's decision