NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0422n.06

Nos. 10-3257, 10-3258

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 28, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| CALIFORNIA FITNESS I, INC., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| Cross-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | C O U R T   F O R   T H E |
| | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| LIFESTYLE FAMILY FITNESS, INC., | ) | |
| | ) | O P I N I O N |
| Defendant-Appellant, | ) | |
| Cross-Appellee. | ) | |
| | ) | |

BEFORE:     COOK, McKEAGUE, and GRIFFIN, Circuit Judges.

**McKeague, Circuit Judge.**  This is a case concerning contractual obligations owed in connection with the purchase of a chain of fitness clubs pursuant to an Asset Purchase Agreement and a Promissory Note.  The seller, Plaintiff California Fitness, filed suit against the buyer, Lifestyle Fitness, for breach of contract and various declarations of monies owed.  California Fitness moved for summary judgment on all claims, arguing that Lifestyle had breached the Asset Purchase Agreement and defaulted on the Promissory Note as a matter of law.  The district court denied the motions for summary judgment and a bench trial ensued.  However, after one day of evidence, the court decided that further proceedings on the issues of breach and default were unnecessary, because the Purchase Agreement and Promissory Note were unambiguous and Lifestyle Family Fitness had

clearly breached and defaulted as a matter of law. The case was assigned to a Special Master for resolution of remaining matters and computation of damages. The district court adopted the Special Master's recommendations, denying California Fitness's request to accelerate the principal in the Note and granting Default Interest of 14% only for the portion of funds not paid. The court awarded California Fitness $189,305 on the breach of the Asset Purchase Agreement, as well as $49,364 on the Promissory Note (which included the outstanding underpayment, and default interest and late charges on only that underpayment).

Lifestyle Family Fitness appeals the district court's determinations that it breached the Purchase Agreement and defaulted on the Promissory Note as a matter of law. California Fitness cross-appeals the district court's denials of full Default Interest and accelerated payment. Because both the Purchase Agreement and the Promissory Note are far from clear in their meaning, and are ambiguous under the law, we **REVERSE** and **REMAND** for further proceedings, for the district court to consider parol evidence to determine the parties' intent and the documents' meaning. We therefore decline to reach the issues raised on cross-appeal.

## I. Background

Plaintiff California Fitness ("CalFit") owned and operated several fitness clubs around Columbus, Ohio. From 1998 to 2005, CalFit contracted with Defendant Lifestyle Family Fitness ("Lifestyle") for administrative services such as billing, paying bills, and managing accounts and staff. In this capacity, Lifestyle was in charge of, and had access to, all of CalFit's financial records.

In October 2005, CalFit and Lifestyle entered into negotiations for Lifestyle to purchase CalFit's business. The price was to be $12,865,000, which would be paid in three parts: a $4 million

cash payment, a promissory note to CalFit for $8 million, and assumption of equipment leases valued at $865,000. After signing a letter of intent, however, CalFit realized the tax consequences of an asset sale (as opposed to a stock sale) and sought to increase the purchase price. The parties agreed that Lifestyle would additionally assume up to $430,000 of CalFit's accrued liabilities at the time of the sale.

CalFit agreed to lend Lifestyle the $8 million needed to finance the transaction. However, because CalFit was not in the business of making loans, it then sought to re-structure the sale so that its risk on the Promissory Note would be lower. Therefore, the principal on the loan was broken into two parts: $1 million and $7 million. The Promissory Note contemplated that Lifestyle would pay interest-only payments on the $1 million portion for 9 months, at which time it would then pay CalFit the $1 million principal amount in full on October 1, 2006. The remaining $7 million would be paid in ordinary interest-plus-principal payments over the life of the entire loan, except that two lump-sump payments of $500,000 would also be paid on October1 of 2007 and 2008. Therefore, essentially, Lifestyle would effectively be paying on two "separate" loans under the Note.

The closing date was originally intended to be October 31, 2006. However, the parties agreed to push this back until November 16, 2005. The sale closed on that date, although it closed "into escrow" until both parties could obtain consent from landlords to the assignment of fitness club leases. The sale was consummated on December 1, 2005.

At closing, the parties executed an Asset Purchase Agreement ("Purchase Agreement" or "Agreement"). The final version included last-minute revisions by both parties, that were added from prior circulated versions. The Purchase Agreement was a fully-integrated contract, explicitly

stating that it "constitute[s] the entire agreement between the parties" and "supersede[s] all prior and

contemporaneous agreements, understandings," or negotiations. The Purchase Agreement included

several pertinent provisions. First, in its Definitions section, the Agreement defined "Purchased

Assets" as having the meaning "assigned to that term in Section 3." Second, Section 3 of the

Purchase Agreement read:

> 3. Purchase and Sale of Assets: Subject to each and every term, condition, and provision of this Agreement, at the Closing, the Seller shall sell to the Buyer, and the Buyer, in reliance upon the covenants, representations, warranties, and agreements of the Seller contained in this Agreement, *shall purchase from the Seller the "Purchased Assets" (as defined herein)* owned or used . . . by Seller in the conduct of Seller's business at the Fitness Centers, as such business is conducted on the date of this Agreement, and the Closing Date, *including, without limitation, each and all of the following items of Property: Except as otherwise expressly provided in this Agreement, all accounts, chattel paper, and instruments existing as of the Closing Date arising prior to the Closing from the conduct of business by the Seller at the Fitness Centers, including, without limitation, all cash, prepaid accounts, accounts, chattel paper, and instruments arising prior to the Closing in connection with Membership Agreements entered into with members of the Fitness Centers. . . .*

(emphasis added). Defendants contend that the inclusion of "cash" in the purchased assets was not

a coincidence, but a specifically negotiated term: indeed, they contend that "cash" was added to the

definition of purchased assets and the purchase price was increased by $70,000, within a day of the

closing.[1] They allege that because the closing was moved to mid-month, the influx of funds and

varying liabilities coming in were harder to determine, and that this $70,000 increase was intended

---

[1]Lifestyle would have presented evidence at trial on this point, including an email from CalFit's accountant to its owner that Lifestyle's last proposal "had [Lifestyle] assuming the cash in the bank as part of the sales price," and an email from Jill Rowe (the wife of CalFit's owner) to CalFit's accountant after the sale stating that the "cash in CalFit's account now belongs to [Lifestyle]."

to compensate CalFit for what the estimated profit would be in November 2005 (after all liabilities

were paid out).

> Lastly, Section 8 of the Purchase Agreement states:

> 8. Closing Prorations, Payments and Adjustments. It is the intent of Buyer and Seller that the prorations, payments, and adjustments at Closing or thereafter shall be made in a manner so that all income and expenses of the Fitness Centers prior to the Closing Date shall remain with or be an obligation of Seller, respectively, and that all income from the Purchased Assets and expenses for Obligations assumed by Buyer hereunder, shall belong to or be an Obligation of Buyer, respectively, from and after the Closing Date.

The agreement, did, however, make Lifestyle responsible for up to $430,000 of CalFit's accrued

liabilities at the time of closing.

> Pursuant to Section 5 of the Purchase Agreement, the transaction also involved a Promissory

Note, obligating Lifestyle to CalFit for $8 million. It included several key provisions. First, Section

2 of the Note stated:

> Interest Rate. All principal evidenced by this promissory note (the "Note") shall bear interest at the rate of seven percent (7%) per annum through December 31, 2006 (the "Regular Rate"). For the remainder of the Note, effective January 1, 2007, the interest rate will be a floating rate equal to the Prime Rate. . . .

The note also included a section on Payments. Section 3(a) read, in full:

> (a) Monthly Principal and Interest Payments. Payments of principal and interest shall be due and payable commencing on January 1, 2006 and on the 1st day of each and every month thereafter. $1,000,000 of the original outstanding principal balance of this Note shall be payable interest only monthly from and after the date hereof with such interest only monthly payments commencing January 1, 2006 and continuing on the first day of each month thereafter through October 1, 2006, on which date, such $1,000,000 together with all accrued interest, shall be due and payable in full. Subject to the provisions of the last sentence of this clause (a), the remaining $7,000,000 original outstanding principal balance of this Note shall require regular monthly payments of principal and interest, which through December 31, 2006 shall

each be in the amount of . . . ($95,436.02). . . . For the period from closing of the [APA] until the first payment January 1, 2006 the Note shall accrue interest at the annual rate of 7% and shall be paid January 1, 2006 in addition to the payments described above. This Note is intended to be a fully amortizing Note over a period of EIGHT (8) years. Notwithstanding anything contained herein to the contrary, Borrower shall make prepayments of principal in the amount of $500,000 each, together with accrued interest thereon, on October 1, 2007 and October 1, 2008.

As noted above, this portion had been altered by the parties, in order to have two "tranches" of payment—a $1 million portion on which Lifestyle would only pay interest until it prepaid the entire principal in October 2006, and a $7 million portion on which Lifestyle would pay standard principal-plus-interest payments.

Section 3(b) of the Note stated:

(b) Maturity Date. Unless otherwise required to [be] paid hereunder, all indebtedness evidenced hereby (whether unpaid principal, accrued interest or otherwise) that remains unpaid shall be due and payable and shall be paid in full on December 1, 2013 (the "Maturity Date"). Each installment of principal plus interest under subparagraph (a) above shall be credited first on account of the interest then accrued on said principal balance remaining unpaid and then in reduction of said unpaid principal. . . .

Section 6 of the Note then read:

Late Charge. In the event Holder does not receive any payment of interest, or principal and interest, or any other charge due under the terms of this Note ten (10) days after the due date for payment thereof, then Borrower shall pay Holder, upon demand, a late charge of five percent (5%) of the amount of any such past due payment as liquidated damages for the loss of use of such funds and for the expenses and costs of collecting and handling such delinquent payment, and Borrower agrees that the amount so charged is a reasonable amount of liquidated damages, in that Holder's actual damages for loss of its investment are difficult or impossible to ascertain. . . .

Section 7 read:

> Default Rate. In the event that there shall occur any default specified in this Note or the Loan Documents, then and in such event the entire principal balance of this Note and all indebtedness secured by the Loan documents shall thereafter bear interest at an annual rate of interest (the "Default Rate") equal to fourteen percent (14%) per annum; and interest at the Default Rate as provided for in this paragraph shall be immediately due and payable to Holder and shall constitute additional indebtedness evidenced by this Note and secured by the Loan documents.

Lastly, Section 10 addressed Default and Acceleration:

> Default and Acceleration. At the election of Holder and after the expiration of a fifteen (15) day grace period commencing with written notice by the Holder, the outstanding principal balance hereof, together with accrued interest thereon, and all other sums payable under this Note, shall be and become at once due and payable at the place herein provided for payment . . .

The parties consummated the transaction under these two documents. At the time of closing, there was approximately $512,000 in CalFit's bank account, which had been, and continued to be, under Lifestyle's control. Lifestyle then paid liabilities out of this money. In February 2006, Lifestyle sent CalFit the November 2005 CalFit financial statements (as was its custom to do when Lifestyle was overseeing CalFit's financials by contract). The balance sheet showed the $512,000 in CalFit's account at Closing. CalFit alleges that Lifestyle intentionally concealed the existence of these account funds during negotiations, and led CalFit to believe there would be "zero" at closing.[2] Upon receiving this financial statement, CalFit President and former owner Greg Rowe contacted Lifestyle regarding the cash balance. CalFit contends that the money in that account belonged to it

---

[2]These occurrences were also the basis of a breach of fiduciary duty claim by CalFit, alleging that Lifestyle took advantage of its position of confidence and access to CalFit's financials in order to deceive them and gain an unfair economic benefit from the sale. This claim, however, is not the subject of this appeal—we instead focus solely on who is contractually entitled to that money.

under Section 8 of the Purchase Agreement, while Lifestyle contends that the account funds were part of what it purchased under Section 3.

Shortly before this exchange, on January 1, 2006, Lifestyle made the first monthly payments, on both the $1 million and $7 million amounts under the Promissory Note. Unbeknownst to either party, Lifestyle was overpaying: it made its payments under an amortization schedule corresponding to the originally anticipated terms—so the second payment was for interest and principal on $8 million, instead of on $7 million. Lifestyle continued to make such payments in February, March, and April 2006. CalFit did not object to these payments at this time.

When Lifestyle noticed its error, it sent CalFit an email on April 5, 2006 explaining the issue and proposing that its next payment, in May, be reduced by the amount of the prior overpayment. Receiving no response from CalFit that month, Lifestyle sent this adjusted payment in May. CalFit cashed this payment. However, at this time, CalFit looked back at the finances itself and concluded that Lifestyle had actually been *under*-paying. It determined that under the Promissory Note, Lifestyle had been obligated to make three separate payments on January 1, 2006: one for interest on the $1 million tranch, one for interest-and-principal on the $7 million tranch, and lastly, a one-time "Stub-period Interest" payment consisting of 7% interest on all $8 million for the period from November 16 until December 31, 2005.

On May 9, 2005, Greg Rowe sent an email to Lifestyle's then-CFO and then-CFO, Todd Bright and Geoff Dyer, stating that Lifestyle was in default on payments.[3] This email was re-sent

---

[3]The email stated, among other things, that Lifestyle "is in default on payments due," and then states that certain "Post Sale 'Interest and Penalties' due since Jan 1, '06 remain past due,"

on May 11. Lifestyle did not respond. On May 18, 2006, CalFit sent Lifestyle a Notice of Default. It demanded that Lifestyle pay $283, 242; this included: the "third component" Stub-period interest payment, for $70,575, that CalFit contended was due January 1, 2006; a $3,528 late charge on that payment per the Promissory Note; and retroactive default interest for the entire period January through May of approximately $215,000 (because CalFit sought Default Interest of 14%). The Notice of Default also stated that the principal balance of the Note would be accelerated if Lifestyle did not cure within the time period set forth in the Note.

Upon receiving this Notice, Lifestyle realized that it had actually failed to pay interest for November 16-30th—confusion was allegedly involved because the sale came out of escrow on December 1, and therefore, the January 1, 2006 payment had only covered December 1-31, 2005. Lifestyle therefore responded to the notice on May 23, 2006 and made an additional interest payment for November 16-30 in the amount of $23,013, as well as a corresponding late charge. However, CalFit initially informed Lifestyle that it would not accept this payment, putting Lifestyle on notice that it was disputing the payment.[4] CalFit instead sought the full Stub-period payment, which would be an interest payment for not only the period from November 16-30, but also on December 1-31.

---

including "7% Interest on the $8M from closing through December 31st." Plaintiffs argue that this email informed Lifestyle that it "had failed to make the Stub-period Interest payment," but this was not actually made clear. As the special master found, "Mr. Rowe did not specify what those penalties were."

[4]On May 5, Jill Rowe forwarded Lifestyle's email to their tax preparer, Karen Hamilton. Hamilton responded that she agreed that the payment schedule sent by Lifestyle was correct; after this, CalFit deposited the reduced May check.

CalFit filed suit against Lifestyle in Ohio state court in June 2006. It alleged that Lifestyle had breached the Purchase Agreement and defaulted on the Note by failing to pay all that was due on January 1, 2006. Lifestyle removed to federal court. In October 2007, CalFit filed an amended complaint in which it asserted that Lifestyle had also breached the Purchase Agreement by not paying CalFit the $512,000 that was in the bank account at the time of closing.[5]

CalFit moved for summary judgment on all of its claims, and Lifestyle moved for partial summary judgment. The district court denied summary judgment on all claims, and set the case for a five-day bench trial beginning in June 2008. The parties filed trial briefs, witness lists, and exhibit lists—these included 2 expert witnesses, 9 other witnesses, and nearly 200 exhibits between both parties. The court had to cancel this trial date due to a conflict with the criminal docket, and later re-set the trial for two days, October 15-16, 2008.

On the first day of trial, the court informed the parties that it needed to be finished by 2:00 the following day. The court heard opening statements from both parties and examination of CalFit's first witness, Lifestyle CEO Todd Bright. At the start of the second day, the district court determined that it could make definitive rulings as a matter of law. While the court had previously denied summary judgment, the court now held that the language of both the Purchase Agreement and the Promissory Note were unambiguous. It concluded that Lifestyle had, as a matter of law, breached both agreements. It held that pursuant to Paragraph 8 of the Purchase Agreement, the income in CalFit's account should have been paid to them by Lifestyle at Closing. Second, the court

---

[5]CalFit also asserted a breach of fiduciary duty claim and several declaratory judgment claims that were later resolved prior to the hearing on damages, and that are not the subject of this appeal.

held "it's clear that" the Note required three payments: payment of interest on the $1 million; the first payment on the $7 million, including interest; and "the 45 or 46 days interest on the entire [eight] million."

Lastly, the court concluded that while Lifestyle "underpaid" by not making the 45-day interest payment, equitable reasons required that CalFit be estopped from recovering Default Rate (14%) interest for the period from the date of the default (January 1, 2006) until CalFit gave notice of the default to Lifestyle and allowed Lifestyle a chance to bring the Note current. The court then appointed a special master to oversee the remaining issues and computation of damages.

The special master conducted a three-day evidentiary hearing from February 23-25, 2009, and then filed his Findings and Recommendations. The special master adhered to the district court's finding that, in addition to the interest payment on the $1 million and the monthly payment on the $7 million, Lifestyle should have paid 45-day interest on the total debt. The special master found that after making the decreased May payment, "Lifestyle's aggregate payments under the Note were deficient by $70,575."

Therefore, the special master found that Lifestyle was in default. He also found that CalFit had issued effective Notice of Default on May 18, 2006. Since the court had denied Default Interest until the time of Notice, Lifestyle was in default by a total of $70,575 for the Stub-period interest and for $3,528 in late charges. The special master noted that "Lifestyle promptly addressed and attempted to correct the problem . . . albeit erroneously with the benefit of hindsight." Lifestyle provided an interest payment for the last half of November, in the amount of $23,125, as well as late charges thereon, for $1,156.

The special master found that "[t]here was no evidence that prior to [Lifestyle's email regarding overpayment], CalFit even knew that there was a third component (i.e., the $70,575.34 component) due under the Note." Indeed, CalFit's expert testified that CalFit's tax preparer, Karen Hamilton, interpreted the note the same way Lifestyle did, and admitted that "Karen Hamilton's position was not unreasonable." The special master further noted that "the Note was never in jeopardy, as Lifestyle made thirty-five (35) consecutive monthly payments on the Note following issuance of the Default Notice."

Ultimately, the special master applied the doctrine of equitable estoppel. "CalFit's month-long silence in the wake of Penny Everhart's April 5, 2006 email and the subsequent tender of the $23,381.01 May Payment by Lifestyle without any response from CalFit until May 9, 2006 is conduct upon which Lifestyle justifiably relied to its detriment in concluding that the reconciliation schedule was correct, the amount of the reconciling payment was accurate, and that CalFit had acquiesced in the analysis." Therefore, the special master agreed that equitable estoppel prevented imposition of default interest and late charges accruing prior to the default notice on May 18, 2006.

The special master then proceeded to address whether, from the notice of default in 2006 until the present, default interest and late fees must be imposed. He concluded that "[t]he imposition of default interest on the Note balance for its remaining duration would be both punitive as to Lifestyle and unwarranted under the circumstances." CalFit had demanded $282,242 to cure the default, and Lifestyle had tried to cure by tendering $24,281: the court ultimately determined both of these amounts were incorrect. The special master reasoned that CalFit never offered Lifestyle the

opportunity to pay $70,474 to cure—and Lifestyle did not know that was the amount necessary until the court entered the order.

The special master reasoned that in seeking default interest and late charges on the entire Note in these circumstances, CalFit "implicitly seeks to transfer to Lifestyle blame for the wrong decisions and mistakes that in hindsight were made by both parties. Under such circumstances, imposition of $3,101,377 in default interest and late charges on a $70,575 default would be unfair and inequitable." He concluded that "[t]he imposition of default interest on the Note balance for its remaining duration would be both punitive as to Lifestyle and unwarranted under the circumstances." Instead, the special master recommended that CalFit be awarded default interest of $27,101 on the portion of the outstanding balance of the Note that has been deficient since 2006, and late charges of $3,528 on the $70,575 underpayment. He calculated that $18,734 of outstanding underpayments remained. Lastly, he concluded that the outstanding principal balance due on the Note as of April 21, 2009 was $3,680,353 (due to the continuous payments since 2006), but did not recommend acceleration of the Note's balance.

Both parties filed objections to the special master's Findings and Recommendations, but the district court adopted the Special Master's recommendations in full as its own findings of fact and conclusions of law. The district court entered final judgment in favor of CalFit, awarding $189,308 for violation of the Purchase Agreement in regard to the bank account.[6] It also awarded $49,364 on

---

[6]The amount due was lower than the original account balance due to various settlements and occurrences not at issue here.

the Note (which included the outstanding underpayment, and default interest and late charges on only

that underpayment). Both parties timely appealed.

## II. Standard of Review

The two issues on direct appeal involve whether the contract documents unambiguously

indicate one meaning, and indicate that Lifestyle breached as a matter of law.[7] When jurisdiction is

based on diversity of citizenship, state substantive law is used when interpreting contract provisions.

*Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 495-96 (6th Cir. 2010) (citing *Hickson Corp.*

*v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566 (6th Cir. 2001)). Here, Ohio law must be applied.

"The interpretation of written contracts, including any assessment as to whether a contract

is ambiguous, is a question of law subject to de novo review on appeal." *Oden v. Assoc. Materials,*

*Inc.*, 945 N.E.2d 123, 1126 (Ohio App. 2010) (quoting *Watkins v. Williams*, 2004-Ohio-7171 (Ohio

App. 2004). Therefore, this court must "review the matter anew, affording no deference to the

findings of the trial court." *State v. Barker*, 2009-Ohio-6907, at *1 (Ohio App. 2009).

When the language of a written contract is clear, a court may look no further than the writing

itself to find the intent of the parties. Contracts must be "given a reasonable construction in

conformity with the intention of the parties as gathered from the ordinary and commonly understood

meaning of the language employed." *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio

2001) (internal quotations omitted). However, "[t]he intention of the parties must be derived . . .

---

[7]The Purchase Agreement states, and neither party refutes, that it was prepared jointly by the parties and shall be construed on parity as between the parties. Therefore, no canon of construction for or against any party is applicable.

from the instrument as a whole, and not from detached or isolated parts thereof." *Whitt Mach.*, 377 F. App'x at 496 (internal quotations omitted).

As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. *Westfield Ins. Co. v. Hunter*, —N.E.2d—, 2011 WL 1518906, at *12 (Ohio 2011). If, however, the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact that may require the consideration of parol evidence to determine the parties' intent. *Crane Hollow, Inc. v. Marathon Ashland Pipe Line, LLC*, 128 Ohio App.3d 57, 74 (2000); *U.S. Fid. & Guar. v. Aultman St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55 (1999).

"If a contract, or, term in a contract, is reasonably susceptible to more than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be employed." *Allason v. Gailey*, 939 N.E.2d 206, 212 (Ohio App. 2010). Furthermore, "conflicting provisions in a contract cannot be interpreted as a matter of law." *N. Frozen Foods, Inc. v. Picciotti*, 2011 WL 1935816, Slip Copy (Ohio App. 8 Dist. 2011) (quoting *JP Morgan Chase, NA v. Bethel*, 2010-Ohio-2987 (Ohio App. 2010)). Instead, the matter must then be resolved by the fact finder, "who must then rely on parol evidence." *JPMorgan*, 2010-Ohio-2987 (citing *Fairmont Creamery Co. v. Ewing, 182 N.E. 883,* (Ohio App. 1932)).

Therefore, the court must apply these principles in evaluating whether the Purchase Agreement and the Promissory Note are ambiguous.

### III. Purchase Agreement

At issue under the Purchase Agreement is whether the cash that was in CalFit's bank account at the time of Closing was properly kept by Lifestyle, or whether it should have been given to CalFit.

Lifestyle contends that the Agreement clearly entitles it to that money. "[A]s to entitlement of cash, [the Purchase Agreement] is unambiguous," they argued to the district court. "Section 3 specifically provides we're entitled to cash." Conversely, CalFit argues that because the funds were in the account prior to closing, under Section 8 they were intended to remain with the Seller, and therefore Lifestyle wrongfully kept that money and breached the Purchase Agreement.

The pertinent provisions bear repeating. The question is, was the money in the account part of what Lifestyle bought? First, Section 3 of the Purchase Agreement read:

> 3. Purchase and Sale of Assets: Subject to each and every term, condition, and provision of this Agreement, at the Closing, the Seller shall sell to the Buyer, and the Buyer, in reliance upon the covenants, representations, warranties, and agreements of the Seller contained in this Agreement, *shall purchase from the Seller the "Purchased Assets" (as defined herein)* owned or used . . . by Seller in the conduct of Seller's business at the Fitness Centers, as such business is conducted on the date of this Agreement, and the Closing Date, *including, without limitation, each and all of the following items of Property: Except as otherwise expressly provided in this Agreement, all accounts, chattel paper, and instruments existing as of the Closing Date arising prior to the Closing from the conduct of business by the Seller at the Fitness Centers, including, without limitation, all cash, prepaid accounts, accounts, chattel paper, and instruments arising prior to the Closing in connection with Membership Agreements entered into with members of the Fitness Centers. . . .*

(emphasis added). Additionally, the Definitions section of the Agreement defined "Purchased Assets" as having the meaning "assigned to that term in Section 3." This lends weight to the idea that "what" was being purchased is determined primarily through Section 3. By its plain language, Section 3 states that Lifestyle would purchase from CalFit "all accounts," "including, without limitation, all cash, prepaid accounts, [and] accounts," among other items. This list is included in the same section that describes the rest of the purchased items, including furniture, interest in leases, contract rights with members, and so on. Importantly, it says the Seller is entitled to these items

"arising prior to the Closing." When looked at alone, the provision seems to clearly entitle Lifestyle

to the funds in the bank account as part of the purchase transaction.

However, Section 8 of the Purchase Agreement then states:

8. Closing Prorations, Payments and Adjustments. It is the intent of Buyer and Seller that the prorations, payments, and adjustments at Closing or thereafter shall be made in a manner so that all income and expenses of the Fitness Centers prior to the Closing Date shall remain with or be an obligation of Seller, respectively, and that all income from the Purchased Assets and expenses for Obligations assumed by Buyer hereunder, shall belong to or be an Obligation of Buyer, respectively, from and after the Closing Date.

This section, conversely, seems to state that the parties intend that CalFit will keep "all income and

expenses" prior to the Closing date—which would include cash in the bank account. CalFit notes

that Section 3 is made "subject to" the other provisions of the Agreement; however, it is unclear

whether Section 8 should modify Section 3's provision because Section 8 deals with

prorating—there's no indication such cash should be prorated. At worst, these two provisions can

be read to be in complete conflict. At best, they are very ambiguous, and much more external

information is needed to determine what items the parties intended to fall under each provision.[8]

CalFit did seek summary judgment on the issue of whether Lifestyle had breached the

Purchase Agreement by keeping the money in the CalFit account; however, the court denied

summary judgment. Though the court did not explain its decision, it implicitly had to determine that

breach of the contract could not be determined as a matter of law—otherwise, if the court at that time

---

[8]The parties assert that they are prepared with factual background, parol evidence documents, and witness testimony that would shed light on their intent on this very issue.

interpreted the Agreement to clearly entitle CalFit to that money, summary judgment would have been appropriate.

At trial, the court explicitly stated that the Agreement was not clear. Defense counsel was trying to explain the distinction between his two arguments, and stated that "to the extent the Court determines that the asset purchase agreement itself is ambiguous, what I'm trying to do—" at which point the court cut him off and explicitly stated, "I think it is ambiguous." Later, the court acknowledged that some parts seem in conflict. "To me - the agreement as a whole seems pretty clear as to what it is intended to do. It may be this or that item that's hard to fit in."

However, after hearing from a single witness—on behalf of CalFit—the court changed its mind. When trial started the second day, the judge told the parties that "I think overnight I was letting my mind gel on this . . . I think I'm actually in a position to make some definitive holdings." He found that the Purchase Agreement unambiguously required the money to go to CalFit. In ruling definitively on the meaning of the Purchase Agreement, the court found that "the provision that says the cash and debts belong to the seller before that date and to the buyer after that date"—which is Section 8—essentially "required sort of a snapshot be taken of that day." However, the defendants had asserted that this conflicted with Section 3, and the court did not find a way to reconcile the two. Ultimately, the court's order did not address the seemingly-conflicting terms in the Purchase Agreement. It found that the "Assert Purchase Agreement is clear and unambiguous," giving explanations for its readings of Paragraph 45 and Paragraph 8. It stated that "the plain meaning" of Paragraph 8 is that all income and revenue before November 16, 2005 belonged to Plaintiffs, and after that date belonged to Lifestyle. However, the court's order nowhere even mentions Section 3,

which specifically states that Lifestyle was purchasing the "cash" in existence on the closing date. "The intention of the parties must be derived . . . from the instrument as a whole, and not from detached or isolated parts thereof." *Whitt Mach.*, 377 F. App'x at 496 (internal quotations omitted). The court's determination based solely on Section 8 violates this requirement.

Simply put, Section 3 stated that cash and accounts "arising prior to the Closing" are purchased and belong to Lifestyle, while Section 8 says that "income and expenses" "prior to the Closing Date" are to "remain with" CalFit. It cannot be said that the meaning of these provisions as they related to the bank account is unambiguous and required judgment for CalFit as a matter of law. The parties also unintentionally acknowledge this, as both rely on much outside information to frame their explanations for the meaning of this provision. Therefore, we find that the Purchase Agreement was ambiguous, and thus **REVERSE** and **REMAND** for the trial court to consider parol evidence as to the meaning of the Agreement.

## IV. Promissory Note

At issue under the Promissory Note is how much Lifestyle was required to pay CalFit on January 1, 2006. CalFit's position, and the one adopted by the district court, is that CalFit was entitled to three payments on January 1, 2006: (1) one month's interest-only payment (whether in advance or accrued) on $1 million of the principal balance of the note; (2) one month's payment of principal and interest (whether in advance or accrued) on the remaining $7 million principal balance of the Note; and (3) another payment of 7% accrued interest on the entire $8 million principal balance of the Note for the 45-day period from Closing on November 16, 2005 until January 1, 2006. Lifestyle takes issue with this third payment—it contends that the Note required payments on the $1

million portion and on the $7 million portion, and also made clear that interest would accrue and be due for the period between Closing and the first payment.

Again, the provisions must be looked at closely. The Note provided that "all principal" would bear interest at the rate of "seven percent (7%) per annum through December 31, 2006." It then stated that payments would commence on January 1, 2006 and on the 1st day of each and every month thereafter. It provided that beginning January 1, 2006, monthly interest-only payments were due on $1 million of the principal until October 1, 2006, "on which date, such $1,000,000, together with all accrued interest, shall be due and payable in full." It provided that the remaining $7 million principal would require "regular monthly payments" of principal and interest. It then stated "[f]or the period from closing of the [APA] until the first payment January 1, 2006 the Note shall accrue interest at the annual rate of 7% and shall be paid January 1, 2006 in addition to the payments described above." Lastly, it stated that each installment "shall be credited first on account of the interest then accrued on said principal balance remaining unpaid and then in reduction of said unpaid principal."

Lifestyle takes issue with CalFit's interpretation of the Note, requiring a third payment. It argues that the Note does not make sense to be read that way, because that would result in "double" interest payments—interest for December would be paid on the $1 million, and on the $7 million, but would then *again* be paid on the whole $8 million by the third payment. Lifestyle therefore asserts that the sentence at issue did not intend to make Lifestyle pay interest again on the exact principal and pay period that the first two payments covered; instead, it was to make clear that interest would accrue, and Lifestyle would have to pay it, for November 15 through December 31st.

Calfit responds that double payment would not occur: it argues that the payments of interest on the $1 million and $7 million components were payments of interest *in advance*—i.e., that the January 1, 2006 payment was for the interest that would accrue from January 1 until February 1. Therefore, they assert, the stub-period interest was for the first month and a half, while the other two January 1 payments were for the coming month. However, CalFit also maintained (at least below) that even if the payments were in arrears (for interest already earned), they were still entitled to the third, stub-period payment. Mr. Rowe stated at his deposition, "If they want to say it's in arrears, I'm still entitled to the third component." When asked, "[I]f it were really interest in arrears rather than advance, is it your position that you're still entitled to all of component three?," he responded, "Absolutely. . . . whatever floated their boat to go ahead and offer me a duplicative payment."

It seems that everyone involved recognized the ambiguity here. The court spoke to the parties and stated, "[w]hoever drew this note would have flunked the drafting note in law class because the first principle is to make it clear." When counsel stated this was a dispute about a note that "Your honor, I think, has acknowledged is not the easiest note to read," the court responded, "You guys drafted it together, apparently. Don't blame me." Before the special master, CalFit's expert testified that CalFit's own tax preparer, Karen Hamilton, interpreted the Note the same way Lifestyle did—CalFit's expert then admitted that "Karen Hamilton's position was not unreasonable." Even the special master called this a "good faith difference of opinion" as to the meaning of the provision.

Furthermore, the district court indicated a need to consider outside evidence: "[O]n the note . . . I'll refrain until I hear what [the witness] has to say about it." At the end of the first day of trial,

the court told the parties that the next day, "I would like to hear the evidence on the note." But the next day, the court began by telling the parties he had reached some conclusions.

The court concluded that the contract unambiguously required not only the first two payments that included interest on the $1 million and $7 million, but also a separate third payment of 7% interest for the stub-period. The ruling did not expressly state whether the court interpreted the Note to "clearly" intend for all interest payments to be in advance, or "clearly" intended payment of double-interest for November and December; it simply stated that those three amounts were due. We find that the district court erred—the Note cannot be said to unambiguously require this interpretation.

"If a contract, or, term in a contract, is reasonably susceptible to more than one meaning, then it is ambiguous and extrinsic evidence of reasonableness or intent can be employed." *Allason v. Gailey*, 939 N.E.2d 206, 212 (Ohio App. 2010). Both parties' interpretations are reasonable.

CalFit's proposed interpretation is arguably reasonable; each of the relevant clauses could be read the way the court read them. Indeed, the Note seems to structure the payments as three separate amounts in Paragraph 3(a). Additionally, CalFit notes that an inference of advance interest payments can be made based on the payment schedule: Paragraph 3(a) states that a set payment will be made on the $7 million portion each month from January 1, 2006 "through December 31, 2006." Paragraph 2 then states that "effective January 1, 2007," the interest rate will change to a floating rate. Then, Paragraph 3(a) states that "[s]tarting January 1, 2007 . . . the monthly principal and interest payments shall be adjusted." CalFit reasonably argues that if payments were in arrears, "the payment due on January 1, 2007, would not have changed; it would have remained" the same as the past payments.

However, there are also problems with CalFit's proposed interpretation. First and foremost, the contract only speaks of "accrued interest," and it does so several times; it makes no mention whatsoever of "interest in advance." CalFit responds to the textual mentions of "accrued interest" by arguing that there is no authority for the idea that "'accrued interest' must always mean 'interest in arrears.'" This belies common knowledge and understanding. Webster's defines "accrued interest" as "interest earned since last settlement date." WEBSTER'S NEW INTERNATIONAL DICTIONARY 13 (3d ed. 1986). It is also defined as "[i]nterest that has been earned but is not yet paid or payable." BLACK'S LAW DICTIONARY 20 (5th ed. 1979). The word "accrue" is defined as "periodically accumulated in the process of time." *Id.* Under the ordinary, commonly-understood meaning of "accrued interest," it refers to interest that has already been earned—interest in arrears.[9] "[I]t is not the court's place to interpret words beyond their plain meaning." *Transworld Sys., Inc. v. Ohio Univ.*, 2003 WL 22905242, at *5 (Ohio Ct. Cl. 2003) (citing *Werner v. Cincinnati Ins. Co.*, 601 N.E.2d 573 (Ohio App. 1991). Furthermore, it strains logic to interpret a contract that only speaks of "accrued interest" to actually contemplate *both* accrued interest and interest in advance; if that was what the parties intended, they could have said so.

CalFit's interpretation that the principal-plus-interest payments on the $7 million were intended to include interest "in advance" creates other inconsistencies as well, on both the $7 million and $1 million payments. It conflicts with the language of Paragraph 3(b), which states that "[e]ach

---

[9]Though it is not controlling if the parties' intent in this contract is otherwise, this court has also stated that "[w]e interpret accrued interest expenses to be interest expenses incurred but not paid or deducted." *FDIC v. First Heights Bank*, FSB, 229 F.3d 528, 537 (6th Cir. 2000).

installment of principal plus interest . . . shall be credited first on account of the *interest then accrued*." The payment can *either* pay interest that has accrued, or pay it in advance; it cannot do both. "Conflicting provisions in a contract cannot be interpreted as a matter of law." *N. Frozen Foods, Inc. v. Picciotti*, 2011 WL 1935816, Slip Copy (Ohio App. 8 Dist. 2011) (quoting *JP Morgan Chase, NA v. Bethel*, 2010-Ohio-2987 (Ohio App. 2010)). CalFit's interpretation also does not seem to fit with the payment schedule set forth on the $1 million portion. Under CalFit's "advance interest" theory, the payment on January 1, 2006 would be for the interest that would build up during January, the February payment would be for the interest in February, and so on. However, since the entire $1 million was set to be paid off on October 1, 2006, no interest would accrue during the month of October. Yet the Note provides that the payment in full on October 1, 2006 would be payable "together with all accrued interest." The same provision is included for the lump-sum payments in 2007 and 2008. This would seem to support the notion that the interest payments were for past accrued interest. "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable . . . or of no effect."). RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981).

It is therefore at least "ambiguous" whether the Note intends for payment of interest in arrears. If accrued interest was actually anticipated, the only way CalFit would still be entitled to a full third payment of interest for the 45-day stub-period is if the contract intended double-payments: the first two payments would provide 7% accrued interest on the entire principal ($1 million and $7 million), and the third payment would be simply a *second* 7% payment on the same principal, for the same time period. That interpretation would seem to conflict with Section 2 of

the Note, which states that all principal will bear interest at 7%—this would instead be an effective rate of 14% for the first month and a half of the Note term.

Adding to the idea that the contract is ambiguous, Lifestyle's position is also reasonable. Section 3(a) begins by specifying that payments of principal and interest shall commence on January 1, 2006, and that such payments will pay "monthly" interest. It is reasonable to suggest that the sentence at issue clarifies (1) that interest does accrue before the first payment, and (2) that though the above speaks to "monthly" interest, the first payments on the $ 1 million and $ 7 million portions must include interest for November 16-30 as well. This interpretation also seems to fit more with common sense, and with the Note's specification of a flat 7% interest liability. *See Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 2009-WL-4698515, at *2 (Ohio App. 2009) (applying "the only logical and reasonable interpretation" of the contract).

"If a contract, or, term in a contract, is reasonably susceptible to more than one meaning, then it is ambiguous." *Allason v. Gailey*, 939 N.E.2d 206, 212 (Ohio App. 2010). Such is the case for this Promissory Note. In such instances, "extrinsic evidence of reasonableness or intent can be employed." *Id.* Therefore, we **REVERSE** and **REMAND** for further proceedings to consider parol evidence in order to determine the intent of the parties as to the first payment.

## V. Cross-Appeals

The case was referred to the special master for determination of the appropriate monetary liabilities—however, this was only because the court first determined that Lifestyle was, as a matter of law, in breach of the Purchase Agreement and in default on the Promissory Note. Because we conclude that these issues were improperly decided and must be remanded for further findings, the

cross-appeal issues regarding damages are not yet ripe for review. The issue of how much CalFit would be entitled to receive, should Lifestyle be found in default, cannot be reached unless and until Lifestyle is properly found to be in default. Therefore, we decline to address them. *See Wilson v. Hill*, 107 F.3d 12 (6th Cir. 1997) (finding that "the cross-appeal is only relevant" with a certain outcome, and if that outcome is not reached, "we need not reach this issue").

## IV. Conclusion

For the foregoing reasons, we **REVERSE** the district court's judgments as a matter of law on both the Purchase Agreement and the Promissory Note, and **REMAND** for further fact-finding on the meaning of the ambiguous terms in those documents.