NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0190n.06

No. 19-4004

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 14, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| INFINITY CAPITAL LLC; JOHN PAUL GOLINO, | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| FRANCIS DAVID CORPORATION, dba | ) | |
| Electronic Merchant Systems, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BATCHELDER, STRANCH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Contracts in many industries regularly grant a stream of income to a party but make clear that the party will forfeit this income if it starts competing with the other side. Courts have generally enforced these forfeiture clauses because they do not absolutely bar competition and instead give the party a choice: compete (and forgo the benefits) or refrain (and accept the benefits). *See Carl Ralston Ins. Agency, Inc. v. Nationwide Mut. Ins. Co.*, 2007 WL 397313, at \*2–3 (Ohio Ct. App. Feb. 7, 2007); *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 516 (7th Cir. 1988). We must decide whether this case's forfeiture clause fits the same mold.

Entities in the credit-card industry known as "independent sales organizations" recruit retail merchants to accept credit cards. These organizations receive a portion of the fee charged merchants for each credit-card swipe. They often use independent "agents" to sign up merchants

and split the merchant's fee with these agents. The part of the fee that an agent receives is known as the agent's "residual" income because the agent typically continues to receive this income even after it leaves the organization. Here, Electronic Merchant Services (EMS), an independent sales organization, signed a contract with an agent, Choice Merchant Services, to recruit merchants. EMS later concluded that Choice had recruited merchants for Choice's own services in violation of a noncompete provision. A separate clause in the contract stated that Choice would forfeit its residual income if it violated this noncompete provision, so EMS stopped paying the income. The district court held that this forfeiture clause was an unenforceable penalty under Ohio contract law.

Given how EMS has treated the forfeiture clause in this case, we agree that Ohio courts would not enforce it. Unlike the forfeiture clauses that courts have upheld, *see Carl Ralston*, 2007 WL 397313, at *3, EMS did not read the contract as offering Choice the option to either solicit merchants (and forfeit its residual income) or avoid that competition (and receive the income). Rather, it sued Choice for breaching the noncompete provision and collected damages for that breach. EMS thus treated the noncompete provision as an absolute ban on competition and the forfeiture clause as another remedy for breach. Because EMS has treated the clause as a remedy, the clause triggers Ohio's distinction between unenforceable penalties and enforceable liquidated damages. And Ohio courts would view the clause as a penalty. Nevertheless, the district court erred when it calculated Choice's damages from its lost residual income. We thus affirm the district court's decision on the parties' liabilities but reverse its damages award to Choice.

I

A

A typical electronic financial transaction involves many actors, not just the consumer that buys a product, the merchant that sells it, and the credit-card company that facilitates the deal. The

transaction often involves an "issuing" bank (which provides a line of credit and a credit card to the consumer) and an "acquiring" bank (which signs up the merchant to accept the card and ensures that the merchant gets paid). *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003). It also involves "payment processors," which make the physical "terminal" for card swiping at brick-and-mortar stores or the digital "gateway" for purchases through online merchants.

This case concerns the merchant side of credit-card transactions. To recruit merchants, many banks rely on "independent sales organizations" (or "ISOs" in the industry's language). Independent sales organizations sign up merchants to accept electronic payments and offer customer support to them. These organizations also monitor their merchants' credit-card sales because they bear the risk of loss for "chargebacks" in which a retail consumer refuses to pay for a credit-card transaction (because of fraud, for example). Given the concerns with nonpayment, independent sales organizations frequently do not permit merchants (especially riskier online merchants) to process unlimited amounts of transactions with their services. They instead cap the total monthly dollar volume that merchants may process. These volume caps require many merchants to contract with additional independent sales organizations for "secondary" processing depending on the amount of card-based business that the merchants anticipate.

Many independent sales organizations, in turn, delegate much of their work to independent "agents" (in some respects analogous to insurance companies using independent agents to sign up customers). Agents might have an "exclusive" contract to recruit for just one independent sales organization or they might recruit for several different ones. These agents will, in the words of one witness, "pound on the doors" of merchants and recruit them to use the independent sales organization. They will also handle customer service for successfully recruited merchants, acting

as a go-between for the merchant and the organization. An agent might, for example, ask the organization to increase a merchant's monthly volume cap if the merchant makes such a request.

Merchants pay a fee for every retail transaction that uses an independent sales organization's payment processing. Independent sales organizations and their agents contract over how to divvy up this fee. The portion of the fee that an agent receives is known as the agent's "residual" income because the contract often will allow an agent to receive the fee as long as the merchant continues to use the independent sales organization. An agent's total monthly residual income for every merchant that the agent has recruited for an independent sales organization is known as the agent's "portfolio" with that organization. Agents can sell these portfolios based on the revenue stream's expected value.

B

EMS has been an independent sales organization for 30 years. It has over 19,000 merchant customers (out of the millions of potential merchants). EMS uses its own sales force to recruit and serve some merchants. To recruit many others, it relies on independent agents like the one involved in this case: Infinity Capital. Owned by John Paul Golino, Infinity Capital does business as Choice Merchant Services. Choice recruited merchants for EMS and was the customer-service contact for the EMS merchants that it signed up.

In 2010, EMS entered into a contract with Choice. This agreement made Choice an exclusive EMS agent: It gave EMS a "right of first refusal" that barred Choice from recruiting merchants for other organizations without giving EMS the right to sign up the merchant. The agreement also contained a nonsolicitation provision that barred Choice from soliciting EMS merchants for unapproved purposes. (These types of provisions are common in the industry.) According to Golino, Choice's owner, Choice quickly became EMS's top agent.

In late 2015, Golino sought to expand Choice's business. He wanted Choice to become its own independent sales organization rather than just be an exclusive agent for EMS. Golino also wanted to become more involved in the market for riskier online merchants. He approached EMS to amend the parties' 2010 agreement. EMS expressed a willingness to adopt a nonexclusive relationship as long as Choice paid off a substantial debt owed to EMS.

In February 2016, EMS and Choice executed an Amended and Restated Agent Processing Agreement ("Amended Agreement"). The Amended Agreement removed the clause giving EMS the right of first refusal for Choice-recruited merchants. It contained two other relevant provisions. The agreement retained a modified "Nonsolicitation Provision." This provision stated that Choice "agrees not to knowingly directly or indirectly" "[s]olicit any EMS Merchants for any purpose other than training and support for EMS Merchant Processing Services" or "[s]olicit or attempt to solicit any EMS Merchants to reduce or discontinue their Merchant Processing Services relationship with EMS." This Nonsolicitation Provision applied during the term of the agreement and during a "Post Termination Tail" (a phrase covering the two-year period starting from the later of the agreement's termination date or the last day that Choice received residual income). In addition, a "Forfeiture Clause" allowed EMS to stop paying Choice residual income if Choice breached, among other provisions, the Nonsolicitation Provision.

The parties did not share the same understanding of these changes. Golino believed that the changes allowed Choice to solicit *existing EMS* merchants for "secondary" processing when, for example, the merchants needed more monthly volume amounts than the amounts that EMS allowed. EMS, by contrast, believed that the changes had a more limited effect—namely, that Choice could now solicit *non-EMS* merchants for Choice's own processing services.

Things came to a head in 2018 when Choice attempted to sell its portfolio of EMS residual income to a bank. While undertaking due diligence for this sale, the bank became concerned about the risk to Choice's residual-income stream from the Forfeiture Clause, which permitted EMS to stop the payments if Choice breached the Nonsolicitation Provision. Choice asked EMS to add a "cure" provision that would allow Choice to fix any breach before EMS could stop paying the income. EMS rejected the proposal. The bank backed out of the deal.

Around this time, EMS learned that Choice had signed up an existing EMS merchant (Alumni Health Center) for processing with Choice. EMS confronted Choice, asserting that this action violated the Nonsolicitation Provision. Choice countered that it had solicited Alumni only because EMS capped its volume and Alumni needed "secondary" processing to "make sales on an uninterrupted basis." EMS nevertheless came to conclude that Choice had solicited dozens of other EMS merchants that had been below their volume caps. EMS demanded that Choice stop signing up EMS merchants for its own processing. After Choice asserted that its soliciting of EMS merchants had not violated the Nonsolicitation Provision, EMS terminated Choice as an agent and ended Choice's residual-income payments.

C

EMS brought a breach-of-contract suit against Choice and Golino in state court, alleging that Choice's solicitation of EMS merchants breached the Nonsolicitation Provision. Choice and Golino removed the suit to federal court on the basis of diversity jurisdiction. They also countered with a federal breach-of-contract suit of their own, one that objected to EMS's termination of Choice's residual income. The district court consolidated the cases.

After a bench trial, the court issued a mixed ruling. *See Infinity Cap. LLC v. Francis David Corp.*, 2019 WL 2336579, at *1 (N.D. Ohio June 3, 2019). The court first addressed the meaning

of the Nonsolicitation Provision. *Id.* at *4–7. It found this provision ambiguous as to whether it barred Choice from soliciting EMS merchants in any manner or whether it barred Choice from soliciting EMS merchants only to reduce their EMS business. *Id.* at *4. Looking to outside-the-contract evidence, the court adopted the latter view: It read the provision as allowing Choice to solicit EMS merchants as long as Choice's conduct did not reduce the merchants' EMS volume. *Id.* at *4–6. But the court also concluded that Choice had still breached the Nonsolicitation Provision even under this narrow reading because many of Choice's solicitations had led EMS merchants to reduce their EMS business. *Id.* at *6–7. It calculated EMS's damages as $57,859.54, rejecting EMS's claim to damages of about a million dollars. *Id.* at *7.

The court next considered the Amended Agreement's Forfeiture Clause, which allowed EMS to stop its residual payments if Choice violated the Nonsolicitation Provision. *Id.* at *7–9. Relying on Ohio contract law, the court held that this clause amounted to an "unenforceable penalty" for a contract breach. *Id.* at *7–8. Choice valued its residual stream at $5 million, the court reasoned, but this provision would allow EMS to "erase" that asset for any violation, no matter how trivial. *Id.* at *9. The court estimated the present-day value of Choice's residual stream as $5,527,791.29. *Id.* at *9 & n.80. After granting Choice prejudgment interest and subtracting the amounts that Choice owed to EMS for its breach of contract and for a separate unjust-enrichment claim, the court awarded Choice $5,423,541.01 plus attorney's fees. *Id.* at *10 & n.90.

In a motion for relief from this judgment, EMS disputed the court's damages calculations for Choice's residual income. *See Infinity Cap. LLC v. Francis David Corp.*, 2019 WL 4674033, at *1–2 (N.D. Ohio Sept. 25, 2019). The court denied its motion. *Id.* at *2.

7

II

EMS raises three arguments on appeal. It challenges the district court's refusal to enforce the Forfeiture Clause, the court's reading of the Nonsolicitation Provision, and the court's damages calculations. We reject the first two arguments but agree with a part of the third.

A

EMS initially asserts that the district court wrongly refused to enforce the Forfeiture Clause. This clause allowed EMS to stop paying Choice its residual income for the EMS merchants that Choice recruited if EMS violated the Nonsolicitation Provision:

> Continuation of Residual Income After Termination. EMS will continue to have the Responsibility to pay Agent Residual Income after the termination of this Agreement, but not if this Agreement was terminated by EMS due to fraud committed by Agent, or with Agent's prior knowledge, or due to a Breach of the Confidentiality Covenant, the Non Solicitation Covenant, or the Assignment/Change of Ownership Covenant. But, even if EMS is Responsible to pay Agent Residual Income after termination, EMS still has the right to later discontinue paying Agent if there is a Breach of the Non-Solicitation or Confidentiality Covenants. These rights to discontinue payment of Residual Income are in addition to and without prejudice to any other rights EMS may have at law or in equity.

Appellant's App'x, Dkt. 31, at 630. The parties do not now dispute that Choice violated the Nonsolicitation Provision (even under the district court's narrow view of it). They also do not dispute that the Forfeiture Clause allowed EMS to stop paying residual income after such a violation. And they do not dispute that Ohio contract law governs the validity of the Forfeiture Clause because the Amended Agreement's choice-of-law provision incorporates Ohio law. *See Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019). The parties instead dispute only whether Ohio contract law permits courts to enforce this clause. This dispute raises a legal question that we review de novo. *See Boone Coleman Constr., Inc. v. Piketon*, 50 N.E.3d 502, 508

(Ohio 2016); *see also Demczyk v. Mut. Life Ins. Co. of N.Y.* (*In re Graham Square, Inc.*), 126 F.3d 823, 827 (6th Cir. 1997).

At bottom, the parties' debate turns on a basic question of identification: What kind of contractual provision is this Forfeiture Clause? We see two possible options.

1. *Option One*. Choice views the Forfeiture Clause as a damages provision designed to identify EMS's remedy in the event of Choice's breach of the Nonsolicitation Provision. If viewed in this light, the clause would implicate the well-known distinction between an enforceable liquidated-damages provision and an unenforceable penalty provision under Ohio contract law (and the common law of contracts). *See Boone*, 50 N.E.3d at 508; *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187–89 (Ohio 1993); *see generally* Restatement (Second) of Contracts § 356(1) (Am. Law Inst. 1981); *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289–90 (7th Cir. 1985). A valid liquidated-damages clause seeks to estimate a party's future loss in the event that the other party breaches the contract. *See Boone*, 50 N.E.3d at 508. An invalid penalty clause seeks to punish the breaching party by requiring it to pay a "penalty" for a breach that has no connection to the other party's expected loss. *See Lake Ridge Acad.*, 613 N.E.2d at 187–88. Courts have regularly followed this distinction when deciding the validity of a remedy in a noncompete agreement that gets triggered if one party competes against the other party in violation of the agreement. *See, e.g.*, *USS Great Lakes Fleet, Inc. v. Spitzer Great Lakes, Ltd.*, 621 N.E.2d 461, 463–64 (Ohio Ct. App. 1993); *see also* R.L.M., Annotation, *Stipulation as to Amount Recoverable for Breach of Contract against Entering Certain Business or Employment as a Provision for Liquidated Damages or for a Penalty*, 59 A.L.R. 1135, Westlaw (database updated 2020).

If this distinction provides the proper frame of reference, EMS has itself likely forfeited the argument that the Forfeiture Clause is anything but an unenforceable penalty. Its opening brief

made only a cursory claim (and only in a footnote) that the clause might qualify as a valid liquidated-damages provision. *See Nat'l Cont'l Ins. Co. v. Aiazbekov*, 818 F. App'x 468, 471 (6th Cir. 2020). Perhaps for good reason. For starters, a valid liquidated-damages clause under Ohio law typically permits a party to seek the contractually specified amount—and no more. *Boone*, 50 N.E.3d at 508. That means that EMS could seek Choice's residual income as its damages. But EMS did not do so. Apart from Choice's forfeiture of its residual income, EMS told the district court that it was entitled to $981,500 in damages due to Choice's solicitations of EMS merchants. And the district court ultimately awarded it $57,859.54 for these solicitations. *Infinity Cap.*, 2019 WL 2336579, at *7. So Choice's forfeiture of residual income was *separate from* EMS's losses, not a *measure of* those losses. The Forfeiture Clause made this clear: "These rights to discontinue payment of Residual Income are in addition to and without prejudice to any other rights EMS may have at law or in equity." Dkt. 31 at 630.

In addition, "[t]he element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach." *XCO Int'l Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1004 (7th Cir. 2004). It is hard to see how a clause seeks to estimate the amount of loss from a breach if it grants the same lump-sum payment for major and minor breaches alike. *See, e.g.*, *Samson Sales, Inc. v. Honeywell, Inc.*, 465 N.E.2d 392, 394 (Ohio 1984). This case proves the point. The Forfeiture Clause does not compel Choice to forfeit its *specific* residual income only for the EMS merchants that it solicits. Rather, it grants EMS *all* of Choice's residual income regardless of whether Choice solicited one tiny merchant (damaging EMS in a nonexistent way) or most of EMS's merchants (driving it out of business). How could the full value of Choice's residual income be an accurate calculation of the loss for

10

both types of breaches simultaneously? EMS does not give an answer. If the Forfeiture Clause is viewed in this light, then, Ohio courts would likely treat it as an unenforceable penalty.

2. *Option Two*. According to EMS, this damages-for-breach view of the Forfeiture Clause is not the right way to look at it. Instead, EMS claims that the clause qualifies as a "condition subsequent"—a contract-law term meaning a condition that relieves a party of a contractual duty. *See Carl Ralston Ins. Agency, Inc. v. Nationwide Mut. Ins. Co.*, 2007 WL 397313, at *3 (Ohio Ct. App. Feb. 7, 2007). Unlike a typical liquidated-damages provision, the clause does not compel the breaching party (Choice) to pay an identified sum to the nonbreaching party (EMS) for a breach. Rather, the clause relieves the nonbreaching party (EMS) of a contractual duty (to pay residual income) if a certain condition arises (Choice solicits EMS merchants). *Cf.* Restatement (Second) of Contracts § 230(1) & cmt. a. In other contexts, Ohio courts have enforced similar clauses tied to similar noncompetition conditions without treating them as "penalties."

The insurance industry provides the best example. Insurers often use independent "agents" to sell policies to consumers. Even after an agent stops working with an insurer, the parties' contract may entitle the agent to continued commissions for the agent's customers who renew their policies. *See, e.g.*, 43 Robert E. Anderson et al., Am. Jur. 2d Ins. § 163, Westlaw (database updated Feb. 2021); 4 Steven Plitt et al., *Couch on Insurance* § 57:43 (3d ed.), Westlaw (database updated Dec. 2020). But the contract may relieve the insurer of the duty to pay these commissions if the agent goes to work for a competitor. Ohio courts have regularly enforced these forfeiture clauses.

Take *Kezdi v. Nationwide Insurance Co.*, 1977 WL 201250 (Ohio Ct. App. Aug. 11, 1977). There, a contract indicated that an insurance agent would forfeit any post-relationship commissions from the insurer if the agent attempted to solicit business from the insurer's customers or signed a contract with a competing insurer. *Id.* at *5. After the agent contracted with a competitor and

solicited the prior insurer's customers, the insurer stopped paying commissions. *Id.* The Ohio appellate court upheld the forfeiture clause. *Id.* It reasoned that the clause was "not a penalty because the agent forfeits these commissions only when he" "accepts employment with another company" or "attempts to take business away from the original company[.]" *Id.* at *6. It added that "the provisions of this contract terminating the renewal commissions are not illegally in restraint of trade because the [agent] is free to leave the [insurer] and become an agent for another company." *Id.*; *see also, e.g.*, *Carl Ralston*, 2007 WL 397313, at *3; *Plazzo v. Nationwide Mut. Ins. Co.*, 1996 WL 62110, at *2–6 (Ohio Ct. App. Feb. 14, 1996); *James H. Washington Ins. Agency v. Nationwide Mut. Ins. Co.*, 643 N.E.2d 143, 150–51 (Ohio Ct. App. 1993); *cf. Hamilton Ins. Servs. Inc. v. Nationwide Ins. Cos.*, 714 N.E.2d 898, 901–02 (Ohio 1999).

Why do Ohio courts treat these forfeiture clauses differently from penalty clauses (whether or not the amount of forfeited benefits accurately estimates the "loss" from competition)? They appear to be following the distinction recognized by other courts: A penalty provision enforces an *absolute* noncompetition ban that "prevent[s] an [agent] from working for a competitor," whereas a forfeiture clause imposes an *optional* noncompetition restriction that only "call[s] for a forfeiture of certain benefits should he do so." *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002). In other words, unlike an unconditional ban, a conditional restriction gives insurance agents the freedom to choose. They may decide to compete (and earn the money from that competition) or not compete (and retain the agreed-upon benefits). A forfeiture clause thus is not a "penalty" for a breach because the decision to compete does not "breach" the agreement. The agreement allows the agent to exercise this option and simply mandates the forfeiture as the consequence of exercising the right to compete. These clauses also do not threaten agents with a total "loss of

livelihood," one of the primary rationales that courts give when rejecting complete competition

bans. *Schlumberger Tech. Corp. v. Blaker*, 859 F.2d 512, 516 (7th Cir. 1988).

On its face, this Ohio caselaw bodes well for EMS. If we interpret the combined effect of

the Nonsolicitation Provision and the Forfeiture Clause as giving Choice the option not to compete

(and retain the residual income) or to compete (and forfeit it), these contractual provisions might

be no different from the forfeiture clauses upheld in these Ohio cases.

Yet EMS's argument fails for a case-specific reason. EMS's actions in this suit show that

it has never read the Nonsolicitation Provision as giving Choice the *option* to compete by forfeiting

its residual income. To the contrary, EMS sued Choice for *breaching* the Nonsolicitation

Provision and obtained damages for the breach. *Infinity Cap.*, 2019 WL 2336579, at *7. The

Forfeiture Clause itself says it applies on a "Breach of . . . the Non Solicitation Covenant," and the

Amended Agreement authorizes injunctive relief for this breach on top of any forfeiture remedy.

Dkt. 31 at 630. EMS thus reads the Nonsolicitation Provision as imposing an absolute ban on

competition apart from the forfeiture of residual income. In the insurance cases on which EMS

relies, by contrast, the insurer "could not sustain a breach of contract claim against" an agent that

competed against the insurer because their contract did not bar the competition. *Carl Ralston*,

2007 WL 397313, at *3. The contract merely identified the forfeiture of commissions as a

consequence of the agent's choice to compete. *See id.*

Perhaps, under general contract-law principles, the Nonsolicitation Provision could be seen

as both a standalone duty subjecting Choice to damages and a condition on EMS's reciprocal duty

to pay residual income. *See* Restatement (Second) of Contracts § 225(3) & cmts. c–d. But EMS

identifies no case that has allowed a party to treat a noncompetition clause simultaneously as both

an absolute ban triggering a right to an injunction and damages if a party competes and a mere

13

condition triggering a forfeiture of benefits for the exact same conduct. And the cases upholding forfeiture clauses have relied on the fact that the contracts gave the agents the option to accept the benefits or compete. *See, e.g.*, *Kezdi*, 1977 WL 201250, at \*6. Regardless, EMS has never attempted to ground its seeming inconsistency in any general rule of contract law. So we need not consider whether Ohio courts would enforce a forfeiture clause tied to a noncompete provision that imposed both an absolute limit on competition and a condition on benefits. In short, EMS's litigating position in this case has treated the Forfeiture Clause as a remedy for breach, not as a condition on residual income. The clause thus triggers the distinction between an unenforceable liquidated-damages provision and an enforceable penalty provision under Ohio law. And Ohio courts would treat this forfeiture remedy as an unenforceable penalty.

In response, EMS (backed by an amicus) claims that a refusal to enforce the Forfeiture Clause will affect a sea change in the payment-processing industry as well as the other industries that regularly place forfeiture clauses in their contracts. Not so. Our ruling is narrow. We take no position on whether Ohio courts would enforce forfeiture clauses (like the clause at issue in *Kezdi* and the cases discussed above) that give agents an option to compete with their former organizations by forfeiting residual income. Under EMS's own view of the Amended Agreement, that type of clause is not before us. Rather, EMS has treated this clause as a penalty for breach.

B

EMS next challenges the district court's interpretation of the Nonsolicitation Provision. This provision provided in relevant part:

> 4.1. Non-Solicitation. During the Term of this Agreement, and during the Post Termination Tail, Agent agrees not to knowingly directly or indirectly
>
> (i) Solicit any EMS Merchants for any purpose other than training and support for EMS Merchant Processing Services, [or]
>
> (ii) Solicit or attempt to Solicit any EMS Merchants to reduce or discontinue their Merchant Processing Services relationship with EMS[.]

14

Dkt. 31 at 629. The Amended Agreement defined "solicit" to mean "make contact with a Merchant or otherwise assist or enable a Merchant in the prohibited activity (even if the Merchant initiated the contact)." *Id.* at 640. The district court found that this Nonsolicitation Provision had an ambiguous scope. *Infinity Cap.*, 2019 WL 2336579, at *4–5. It thus relied on outside-the-contract evidence to hold that the provision barred only Choice solicitations that led EMS merchants to reduce their EMS business. *Id.* EMS challenges both aspects of the district court's decision.

1. *Is the Nonsolicitation Provision unambiguous?* EMS argues that the first part of the Nonsolicitation Provision (Subsection 4.1(i)) unambiguously barred Choice from soliciting EMS merchants to use Choice's processing under any circumstances. That is true, EMS says, even if this solicitation did not cause the merchants to reduce their EMS business (because, for example, the merchants had reached their EMS volume caps and needed "secondary" processing). EMS is correct that, "[u]nder Ohio law, '[i]f a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.'" *Masco*, 795 F. App'x at 427 (quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 685 (Ohio 1995)). It is also correct that whether a contract is clear or ambiguous raises a legal issue that we review de novo. *See Cal. Fitness I, Inc. v. Lifestyle Fam. Fitness, Inc.*, 433 F. App'x 329, 337 (6th Cir. 2011); *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991). And it is correct that if the contract is unambiguous, we may not consider extrinsic evidence to interpret it. *See Masco*, 795 F. App'x at 428.

But EMS is incorrect that this Nonsolicitation Provision is unambiguous. To be sure, Subsection 4.1(i) could be read broadly to allow Choice to make contact with EMS merchants only for "training" and "support" for EMS's payment-processing services and for no other purpose (whether or not the contact relates to those EMS payment-processing services). This view would

15

read this subsection to bar Choice from signing up EMS merchants for its own payment-processing services even if it would not affect EMS's business.

Yet this broad reading creates a problem. We must read the Nonsolicitation Provision "as a whole" and attempt to "avoid any interpretation of one part which will annul another part." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facs. Auth.*, 678 N.E.2d 519, 527 (Ohio 1997); *see also Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 16 N.E.3d 645, 651–52 (Ohio 2014). And EMS's reading of Subsection 4.1(i) would render Subsection 4.1(ii)'s ban on Choice's contacting EMS merchants to reduce their EMS business "meaningless," which is "neither acceptable nor desirable under the normal rules of contract construction." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 597 N.E.2d 1096, 1103 (Ohio 1992). Might Subsection 4.1(i) be read more narrowly to better reconcile the two clauses? Perhaps it could be read to regulate only Choice's contacts with EMS merchants when acting in its capacity *as an EMS agent*: Choice may contact EMS merchants for the purpose of "training" and "support" for "EMS Merchant Processing Services," but not for other "purposes" related to those services. Put another way, the first clause might govern Choice's contacts with EMS merchants when wearing its EMS hat (it permits only contact for training and support) and the second clause might govern Choice's contacts with EMS merchants when wearing its own (it permits only contact that does not harm EMS's business). At the least, we think the provision is ambiguous on the point.

A broader view of the entire Amended Agreement confirms the ambiguity. The agreement required Choice to sign a "Rep Agreement" with each of its "Representatives who are involved with EMS Merchants[.]" Dkt. 31 at 630. (The agreement defined "Representative" to include Choice's officers, employees, and independent contractors. *Id.* at 640.) Yet "Rep Agreement" was defined to mean a written agreement that barred Choice's Representatives from soliciting

16

EMS merchants *only* "to reduce or discontinue" their EMS business. *Id.* at 639. By implication, therefore, this "Rep Agreement" definition permitted Choice's Representatives to solicit EMS merchants for Choice's payment processing as long as that solicitation did not reduce EMS's business. If, however, the Nonsolicitation Provision barred that conduct, Choice could be found liable for violating the Nonsolicitation Provision when its Representatives engaged in conduct permitted by their Rep Agreements. This tension suffices to trigger the Ohio rule that "conflicting provisions in a contract cannot be interpreted as a matter of law." *Cal. Fitness*, 433 F. App'x at 337 (quoting *N. Frozen Foods, Inc. v. Picciotti*, 2011 WL 1935816, at *2 (Ohio Ct. App. May 19, 2011)).

In response, EMS relies on its employee's testimony about the purpose of the two subsections to argue that its reading does not render Subsection 4.1(ii) superfluous. This employee claimed that Subsection 4.1(i) could be read to *allow* Choice to ridicule EMS's services (and so effectively solicit EMS merchants for its own) when Choice engaged in EMS training and support. EMS added Subsection 4.1(ii), the employee claimed, to clarify that Choice could not do so. This argument has two problems. The first: It overlooks Ohio law. We must decide whether a contract is clear by examining its language, not extrinsic evidence about its purpose. *See Masco*, 795 F. App'x at 428. That type of evidence gets triggered only once we find the contract ambiguous. *See, e.g.*, *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). At this initial interpretive stage, "[i]ntentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989). The second: this testimony all but admits that Subsection 4.1(i) is ambiguous. EMS's theory for avoiding superfluity rests on the notion that Subsection 4.1(i) might

permit Choice to solicit EMS merchants for Choice services when engaged in training or support. That theory contradicts EMS's claims that Subsection 4.1(i) categorically bars such solicitations.

Even if the two subsections are redundant, EMS next argues, we should accept the redundancy because it arises from a common "belt-and-suspenders" approach to contract drafting. We agree that "[n]othing prevents the parties from using a belt and suspenders approach in drafting" a contract "to be doubly sure" that general language covers a specific situation. *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577 (6th Cir. 2010) (quoting *In re SRC Holding Corp.*, 545 F.3d 661, 670 (8th Cir. 2008)). When the contract as a whole suggests that the parties have done so, courts should respect their choice. *See id.* at 577–78. Here, for example, if Subsection 4.1(ii) had absolutely barred Choice from soliciting EMS merchants to use Choice's services, a court would have to enforce that broad ban whether or not it overlapped with Subsection 4.1(i). But Subsection 4.1(ii) does not do so. Rather, it prohibits only those solicitations that reduce an EMS merchant's business with EMS. It thus carries the implication that Choice may otherwise solicit those merchants. That implication is reinforced by the definition of "Rep Agreement," which likewise permits Choice Representatives to solicit EMS merchants for Choice services as long as any solicitation does not reduce EMS's business. And the scope of Subsection 4.1(i)'s general ban is not sufficiently clear to eliminate this implication in Subsection 4.1(ii). In the specific context of this agreement, then, we do not find it unambiguous that Subsection 4.1(ii) represents merely redundant contract drafting.

2. *Does the Nonsolicitation Provision bar all solicitations?* EMS next argues that the outside-the-contract record shows that the parties intended to categorically bar Choice from soliciting EMS merchants for Choice services. Under Ohio contract law, however, once an appellate court finds a contract ambiguous, the court must leave it to the finder of fact (here, the

district court) to determine what the parties intended in the language that they used. *See Cal. Fitness*, 433 F. App'x at 337. And we will overturn the district court's findings of fact on this issue only if they are clearly erroneous. *See Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir. 2001). EMS's challenge thus must fail as long as the court's findings "reflect[] a 'plausible' and 'permissible view [] of the evidence.'" *Detroit Pub. Schs. Program Mgmt. Team v. Valley Forge Ins. Co.*, 483 F. App'x 150, 152 (6th Cir. 2012) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

The district court's findings meet that low bar. Treating the parties' precontract negotiations as inconclusive, the court relied primarily on their "course of dealing" under the Amended Agreement. *Infinity Cap.*, 2019 WL 2336579, at *5; *see, e.g.*, *Pertoria, Inc. v. Bowling Green State Univ.*, 2014 WL 4291637, at *9 (Ohio Ct. App. Sept. 2, 2014). Through Golino, Choice repeatedly informed EMS that it was recruiting volume-capped EMS merchants for "secondary" processing with Choice. Choice also asked EMS to provide guidance about whether the Nonsolicitation Provision would cover specific "scenarios" involving Choice's recruitment of EMS merchants. Yet, as the district court explained, "Choice's repeated attempts at clarification were met with responses ranging from the non-existent, to the unhelpful, to the outright misleading." *Infinity Cap.*, 2019 WL 2336579, at *6. EMS either failed to respond to Choice's inquiries, acknowledged that Choice was signing up EMS merchants for secondary processing ("go ahead"), or reiterated *only* that Choice could not solicit merchants to "reduce or discontinue their Merchant Processing Services relationship with EMS." *Id.* at *5 (quoting emails). If EMS read the Nonsolicitation Provision in the broad manner that it now claims, these responses would have made no sense. *Any* solicitation would have been barred, and EMS would have responded in that clear fashion. But it did not. This evidence at least made it "plausible" for the district court

to conclude that EMS and Choice both believed that the Nonsolicitation Provision allowed Choice to solicit EMS merchants as long as its efforts did not reduce their business with EMS. *Detroit Pub. Schs.*, 483 F. App'x at 152 (quoting *Anderson*, 470 U.S. at 574).

C

EMS lastly challenges the district court's damage awards. EMS has forfeited any claim against the court's calculation of its own award, but the court did err when calculating Choice's.

1. *EMS's Damages.* Although EMS requested close to a million dollars in damages for Choice's breach of the Nonsolicitation Provision, the district court ultimately awarded it only $57,859.54. *Infinity Cap.*, 2019 WL 2336579, at *7. On appeal, EMS suggests that the district court should have awarded the full amount requested. But we find its argument forfeited. EMS's opening brief offered only a conclusory footnote as to why the district court erred in calculating this award. That type of half-hearted argument does not suffice to raise an issue on appeal. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006). And while EMS's reply brief provided a more fulsome discussion, those arguments came too late. *See Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

2. *Choice's Damages.* The district court awarded Choice over $5 million in damages for EMS's decision to terminate its residual income in August 2018. *Infinity Cap.*, 2019 WL 2336579, at *9. The court found that Choice received $133,000 in monthly residual income at that time. *Id.* It next estimated a 2% merchant-attrition rate per month. *Id.* That is, it estimated that Choice's residual income would decline by 2% each month as Choice-recruited merchants gradually stopped using EMS's processing. *Id.* These two estimates led the court to calculate a total stream of monthly payments of $6,061,223 lasting over ten years. *Id.* at *9 & n.79. It concluded that the present value of this revenue stream was $5,527,791.29. *Id.* at *9 & n.80. We review this type of

bench-trial damages award for an abuse of discretion. *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015). And "[a] court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009) (quoting *United States v. City of Warren*, 138 F.3d 1083, 1096 (6th Cir. 1998)).

Both a legal error and a factual error undergird this damages award. Start with the factual error. The court found that Choice received $133,000 in monthly income "[a]t termination." *Infinity Cap.*, 2019 WL 2336579, at *9. The court made that finding based on Golino's testimony: "This is my life's work that you're taking away from me here, $133,000 a month." Tr., R.52, PageID#1384. Yet Golino made that statement in passing. And he was not discussing damages; he was explaining an email that was attempting to broker a compromise with EMS. As he later indicated, EMS's last residual payment in August 2018 was for only $127,896.62. *Id.*, PageID#1422. Choice's monthly residual report confirms this amount, as does Choice's posttrial brief. In a Rule 60(b) motion, EMS claimed that the final payment was actually $127,977.82. Either way, we are "left with the definite and firm conviction" that the district court started its calculations with the wrong number. *Hance*, 571 F.3d at 517 (citation omitted).

Now turn to the legal error. "[T]he sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach[.]" *Lake Ridge Acad.*, 613 N.E.2d at 187. A contract damage calculation thus must be based on a methodology that places the entities in the position that they would have been in had a breach never occurred. *See Blain's Folding Serv., Inc. v. Cincinnati Ins. Co.*, 109 N.E.3d 177, 181 (Ohio Ct. App. 2018). This calculation of "expectation" damages generally has two components. *See* Restatement (Second) of Contracts § 347. It initially seeks to measure the gains that the injured party would have obtained had the

21

breaching party performed on the contract or, stated conversely, the losses that the party suffered as a result of the breach. *See, e.g.*, *Top Notch Excavating, LLC v. Peterman*, 2012 WL 5508291, at *3 n.2 (Ohio Ct. App. Nov. 9, 2012); *Rasnick v. Tubbs*, 710 N.E.2d 750, 754 (Ohio Ct. App. 1998). At the same time, expectation damages are not designed to make the injured party *better off* than it would have been had the contract been performed. *See Miller Med. Sales, Inc. v. Worstell*, 1993 WL 538300, at *2 (Ohio Ct. App. Dec. 21, 1993). So a proper damages calculation must reduce these expected gains by the expected "cost or other loss" that the party would have incurred through performance. Restatement (Second) of Contracts § 347(c). And "[w]hen a contract is repudiated at a time when the injured party has not yet performed, ordinarily a savings to the injured party occurs by reason of not having to perform his promise." *F. Enters., Inc. v. Ky. Fried Chicken Corp.*, 351 N.E.2d 121, 125 (Ohio 1976). The burden rests on the injured party to prove both the expected gains and the expected costs (or lack thereof) from performance. *See MNM & MAK Enters., LLC v. HIIT Fit Club, LLC*, 134 N.E.3d 242, 252 (Ohio Ct. App. 2019).

Here, the district court committed legal error because it overlooked the costs side of the damages equation. When calculating Choice's estimated revenue stream, it "never considered or discussed whether and how to reduce this proposed gross revenue figure by [Choice's] expenses to try to reach an amount representing [Choice's] net profits." *Id.* It is not at all clear that this revenue stream was costless to Choice, which bore the burden to prove its (lack of) expenses. *See id.* To give one example, the district court's estimation of a 2% merchant-attrition rate came from Golino's testimony about Choice's average attrition rate. Tr., R.52, PageID#1425. Elsewhere, however, Golino made quite clear that a low attrition rate is not cost-free: "A good agent will retain and reduce the attrition on the merchants. An agent that signs up a merchant and just disappears and leaves it to the [independent sales organization] to do the customer service, those deals tend

to cancel a lot sooner." *Id.*, PageID#1253–54.   And Choice's counsel likewise conceded that "there's definitely maintenance with respect to keeping" merchants. *Id.*, PageID#1211.   The district court's opinion rejecting EMS's Rule 60(b) motion confirms this error.   In the year following EMS's last residual payment, EMS's evidence suggests that the *actual* attrition rate of the residual portfolio was 5.27%, over two and a half times the district court's estimate.   When rejecting this evidence, the court reasoned that "Choice would have presumably continued to manage its portfolio" without EMS's breach and so would have obtained a lower attrition rate. *See Infinity Cap.*, 2019 WL 4674033, at *2.   Yet the court's initial calculation did not consider how Choice's maintenance "costs" should go into the damages calculation. *See* Restatement (Second) of Contracts § 347(c).

There may (or may not) have been other costs as well.   As EMS notes, for example, the Nonsolicitation Provision barred Choice from soliciting EMS merchants to reduce their EMS business for two years after its residual-income payments stopped.   It is not clear on this record whether Choice adhered to this contract requirement (another potential "cost").   But we can pretermit this discussion.   By failing even to consider the costs side of the equation, the district court "use[d] an erroneous legal standard." *Hance*, 571 F.3d at 517 (citation omitted).   We thus vacate and remand for additional proceedings on damages at which Choice can meet its burden "regarding the issue of expenses." *Miller Med. Sales*, 1993 WL 538300, at *2; *see Rasnick*, 710 N.E.2d at 754.   The district court should recalculate Choice's damages in light of any new evidence presented by the parties under the proper legal standards.

Choice's responses lack merit.   On the district court's factual error, Choice claims that no evidence in the record conflicted with Golino's passing reference to $133,000 as the monthly residual stream at termination.   To the contrary, Golino's later testimony of the final amount at

termination (not to mention Choice's posttrial brief) both contradicted this number. Choice also claims that the district court's $133,000 calculation was simply an average of the last several months of Choice's residual-income payments. But the court did not indicate that it was undertaking that average. Nor does Choice provide a factual basis for it.

On the district court's legal error, Choice argues that the costs of maintaining this revenue stream were "negligible." But Choice presented no evidence to support this claim. And it bore the burden of proof. *See Miller Med. Sales*, 1993 WL 538300, at *2.

All told, we affirm the district court's judgment on all liability issues. But we reverse its calculation of Choice's damages and remand for proceedings consistent with this opinion.